# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | \| |
| | \| |
| **v.** | \| **CRIMINAL CASE NUMBER:** |
| | \| **1:18-CR-00203-AT-JSA** |
| **ADOLFO ALEJANDRO RAUDA-** | \| |
| **CONSTANTINO (1) and** | \| |
| **ABEL DOMINGUEZ-MARTINEZ** | \| |
| **(3)** | \| |

## <u>ORDER AND REPORT AND RECOMMENDATION</u>

This drug trafficking case is before the Court on the motions [64][65] of

Defendants Adolfo Rauda-Constantino ("Rauda") and Abel Dominguez-Martinez

("Dominguez") to suppress the fruits of two search warrants.  Specifically,

Defendant Rauda moves to suppress geolocational data relating to his cell phone,

the collection of which was authorized by a warrant issued by the Gwinnett County

Superior Court [64].  Defendant Dominguez moves to suppress the results of a

search of a truck, which was authorized by a warrant issued by U.S. Magistrate

Judge Catherine Salinas [65].

As to the affidavit supporting the geolocational search warrant into

Defendant Rauda's phone, the Government agrees that false statements were made,

although it contends that the statements were immaterial to probable cause and were made unintentionally.  After an evidentiary hearing, the Court agrees that the false statements were made unintentionally.  The Court further finds that the other issues raised by each Defendant are meritless.  Thus, the Court **RECOMMENDS** that the Motions To Suppress Search Warrants [64][65] be **DENIED**.[1]

## I.  RAUDA'S MOTION TO SUPPRESS GEOLOCATIONAL DATA [64]

The first motion concerns Rauda's challenge to a Gwinnett County warrant for geolocational cell phone data.  Rauda argues that the affidavit was procured by false statements and that suppression is warranted under *Franks v. Delaware*, 438 U.S. 154 (1978).  Rauda also argues that the geolocational warrant was "void *ab initio*," because the Judge lacked authority to issue a geolocational cell phone warrant, and/or to order tracking of a device outside of Gwinnett County.

### A.  *Background*

#### 1.  The Warrant and Application

On May 2, 2018, Investigator A. Saunders of the Snellville Police Department applied for and received a warrant from the Honorable George F.

---

[1] The Motions [64][65] include separate requests to suppress statements, which challenge the voluntariness of Defendants' admissions and the officers' compliance with *Miranda v. Arizona*.  The Court treats these requests as severable from the requests to suppress the search warrants, and **DEFERS** the Motions to the District Judge to the extent they seek suppression of statements.

Hutchinson, Superior Court Judge of the Gwinnett Judicial Circuit, allowing

receipt of geolocational data for forty five (45) days relating to a cell phone that

was later determined to be in Rauda's possession.  [64-2].  In the warrant

application, Investigator Saunders stated that:

> I am making this sworn application, affidavit, and written complaint which states facts sufficient to show probable cause that the specified crime has been, and is being, committed within Gwinnett County; and a particular instrument, article, or thing, information or data (whether tangible or intangible; corporeal or incorporeal; visible or invisible) is evidence, to-wit: the contents of the specified device, with service provided by the service provider.  There is probable cause that the specified device is intended for use, and has been used, and is evidence of commission of the specified crime.

> The facts establishing probable cause that the foregoing specified device is intended for use and has been used in the commission of the specified crime, are as follows:

> …… [omitting generalized "Officer Background" section]

> On April 30, 2018, a reliable confidential informant ("CI") working for the Department of Homeland Security contacted an HSI agent with information about the mobile phone number **404-438-3328** [i.e., the Subject Telephone].  The CI has provided reliable information over the course of the past year.  Information from the CI has led to the seizure of over $200,000 dollars in U.S. currency, and helped develop ongoing narcotics investigations.  There is one prior drug arrest and resulting charge in CI's criminal history, which has been adjudicated.  CI voluntarily came to the Department of Homeland Security ("HIS") to become a CI, and has been providing information for monetary compensation.

> CI told his contact at HSI that he had just spoken on the phone with a member of a Mexican drug trafficking organization ("DTO"). CI is affiliated with this DTO, and works as a middleman to

coordinate details on drug sales.  Per CI's contact in Mexico, there
was a buyer ("B") in the Atlanta area who wanted to purchase five
Kilograms (5 kg) of heroin.  CI never learned B's name.  CI did learn
that B's phone number is **404-438-3328**, as CI was responsible for
contacting B, to let B know where to pick up his 5 kilograms of
heroin.  The location for B to get the 5 kilograms of heroin was 230
Grayland Court, in Lawrenceville, a city in Gwinnett County,
Georgia.  B had to pick up his purchase within the next eight (8) days.
CI also stated that a shipment of approximately twenty kilograms (20
Kg) is supposed to arrive at the same address of 230 Grayland Court
in Lawrenceville, during the same time frame.

[64-1] at 4.  The warrant application stated that both the subscriber of the Subject

Telephone and the subscriber's address were "Unknown." *Id*. at 1.

Based this affidavit, Judge Hutchinson granted the requested warrant,

directed to T-Mobile USA (c/o its registered agent, in Norcross, Georgia), for the

requested geolocational data for the Subject Telephone.  In so doing, Judge

Hutchinson specifically found:

> There is probable cause that, within Gwinnett County, the
> above described crime/offense is being committed; and that a
> particular instrument, article, or thing, information or data, (whether
> tangible or intangible, corporeal or incorporeal, visible or invisible) is
> evidence, to-wit: the specified device, with service provided by the
> above-named service provider, is intended for use in the commission
> of the specified crime.

[64-2] at 2.

## 2.  The Evidentiary Hearing

In his Motion, Defendant alleged that this warrant was obtained based on false statements by Investigator Saunders. Specifically, the Defendant alleged that the drug transaction did not occur at or near the Gwinnett County address identified in the application; that the geolocational signals that were obtained showed the Subject Telephone to almost exclusively be located in Dekalb County, not Gwinnett County; that during the period of the warrant the investigators were surveilling an address in Dekalb County, not the Lawrenceville address identified in the application; and that the investigators never informed Judge Hutchinson or unilaterally ceased relying on the Gwinnett County warrant once it allegedly became clear that the phone was actually in Dekalb County. [64] at 17-19. The undersigned agreed that the allegations were at least sufficiently close to warrant an evidentiary hearing on this limited issue as requested by the Defendant [79]. Thus, the Court held a hearing on May 7, 2019 [95].

In the hearing, Investigator Saunders and his source of information from the U.S. Department of Homeland Security-Investigations ("HSI"), Special Agent Steven Ledgerwood, both testified. S/A Ledgerwood testified that the same CI had had several weeks earlier provided information about a prior telephone number (the "Prior Phone"). Tr. [99] at 45-46. The CI explained that the user of the Prior Phone was part of a trafficking group receiving "loads of narcotics here in Atlanta" from Mexico. *Id*. The officers received a geolocational warrant relating to the

Prior Phone from a Judge in Coweta County, Georgia, and the results ended up showing that the user of the Prior Phone was primarily located at 230 Grayland Court, Lawrenceville, in Gwinnett County. *Id*. at 45-48.

As a result, another HSI agent contacted Investigator Saunders on April 6, 2018, approximately 3-4 weeks prior to the search warrant at issue here, to investigate possible drug trafficking activity at the 230 Grayland Court address. *See* Tr. [99] at 9, 22. HSI reported to Investigator Saunders that they had been receiving information from a geolocational warrant indicating that a suspected drug trafficker was located at that address. *Id*. Over the course of the next few days or weeks, Investigator Saunders conducted surveillance at Grayland Court on two occasions and drove by that address on other occasions. Id. at Tr. 10-11. During these activities, Investigator Sanders did not specifically see anything suspicious, although he knew that the address was in a high drug trafficking area. *Id*. at 15-17, 23-24.

On one occasion in April prior to the April 30th search warrant, HSI agents noticed that the geolocational data from the Coweta warrant indicated that the user of the Prior Phone had left the Grayland Court residence and was traveling southbound towards Macon. *Id*. at 48-49. The agents reached out to the Georgia State Patrol, which initiated a traffic stop. *Id*. at 49-51. While the stop apparently did not elicit evidence of drug trafficking activity, the officers were able to

determine that one of the vehicle's occupants had prior drug-related criminal history; that the occupants were en route to meet another individual (one of the occupant's brothers) who also had a prior drug conviction; and that one of the occupants had identification that indicated residence at 230 Grayland Court.  *Id*. at 50.  The officers conducted a stop of another vehicle leaving Grayland Court on another occasion, but it turned out to be just an Uber car.  Tr. at 15.

S/A Ledgerwood also learned that the individuals who had been frequenting the Grayland Court address were observed by DEA agents conducting surveillance in a separate case.  *Id*. at 41-42.  According to DEA, the individuals were involved in what appeared to be a potential sale of a vehicle with a hidden smuggling trap inside.  *Id*. at 41-42, 54.  The HSI agents asked Investigator Saunders to periodically monitor the Grayland Court address, but they otherwise discontinued receiving data from the Coweta County warrant because of cost.  *Id*. at 51.  At some point, the agents also identified another apartment that was also tied to the same subjects although no other specifics were elicited at the hearing.  *Id*. at 51.

Around April 30, 2018, in the tip that led to the instant warrant, the same CI provided more information to S/A Ledgerwood about a specific upcoming planned transaction.  The CI informed S/A Ledgerwood that another unidentified individual, using a new 404-328-3328 number (the "Subject Phone" or "3328 Phone"), would be picking up five kilograms of heroin, from the holder of the

Prior Phone and/or the other individuals in the same drug trafficking group.  *Id*. at

33-35.  More specifically, according to the CI, the same unnamed group of

individuals—who HSI's investigation subsequently associated with the 230

Grayland Court address—were to receive a 20 kilogram shipment of heroin, and

the user of the Subject Phone was to pick up five kilograms of that shipment.  *Id*. at

34-35, 51, 58.  The CI told S/A Ledgerwood, as of April 30, 2018, that the

transaction was anticipated to occur within 8-14 days.  *Id*. at 42.

The CI did not state that the transaction would occur at 230 Grayland Court,

and S/A Ledgerwood did not know that it would necessarily occur there.  Rather,

according to S/A Ledgerwood, "we just knew that the occupants that lived there [at

Grayland Court] were receiving a load," and that the user of the 3328 Phone would

be picking up a portion.  *Id*. at 59-63.

On April 30, 2018, S/A Ledgerwood spoke by phone with Investigator

Saunders and verbally relayed the CI's information.  *Id*. at 20-21.  Investigator

Saunders then typed up the information that he believed he received from S/A

Ledgerwood in the affidavit, which he believed to be accurate and credible, and

presented it to Judge Hutchinson.  *Id*. at 20-22.  The record includes no indication

that S/A Ledgerwood reviewed or was furnished a copy of the affidavit before it

was presented.

B.    *Discussion*

1.    Standing

The Government at the outset contests Defendant Rauda's standing to seek suppression of the data obtained from the Subject Telephone.

It is well established that a criminal defendant may not seek suppression of evidence based on violations of another person's rights.  Thus, to have the standing required to claim protection of the Fourth Amendment, "the person invoking the protection must have an objectively reasonable expectation of privacy in the place searched or item seized."  *Rehberg v. Paulk*, 611 F.3d 828, 842 (11th Cir. 2010). "To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that 'society is prepared to recognize as reasonable.'"  *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).  The burden rests with the party invoking the protections of the Fourth Amendment, here Rauda, to establish his standing.  *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995).

As the Government points out, "[c]ourts have determined that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name or when an individual uses an alias or fictitious name and there is no other evidence linking the defendant to the item or property."  *United States v. Suarez-Blanca*, No. 1:07-CR-0023, 2008 WL 4200156-MHS/AJB, at *6 (N.D.

Ga. Apr. 21, 2008) (*citing United States v. Daniel*, 982 F.2d 146, 149 (5th Cir. 1993)).  The Government argues that Defendant fails to make such a showing here.

The telephone line at issue is subscribed to by someone other than the Defendant, at an address apparently unaffiliated with the Defendant, to wit, "Aurora Reyes, 1123 N. Peniel St., Oklahoma City, OK 732127-4246."  [64-5]. Rauda, however, has supplied an affidavit by which he testifies to his connection to and use of this phone.  Specifically, "approximately one month before [his] arrest," Rauda provided money to a woman named Dunia Alvarado for her to purchase this and another device, and to obtain a one-month subscription plan.  [64-4 ¶ 2]. Rauda and Alvarado purchased these devices together, but Alvarado obtained the subscription plan, with money provided by Rauda.  *Id*.  While Alvarado obtained the subscription, Rauda testifies that he funded the purchase of both devices and the plan, and that the device that was subject to the warrant "was for my exclusive use."  *Id*.  ¶ 3.  In other words, according to the Defendant, the device and subscription for this device were purchased with his money and for his exclusive use, but by another person.  Although Defendant does not use these terms, it appears that Defendant effectively used a "straw" purchaser or intermediary to obtain this device in a way that hid his identity from the paperwork.

There is no explanation as to how the name "Aurora Reyes" or the Oklahoma City address came to be associated with this subscription, or even

whether there is such a person.  The Government argues that Defendant cannot establish standing without, at least, establishing his link to the Reyes identity.

The Court finds that the Defendant's sworn testimony is sufficient to establish his standing.  The affidavit demonstrates Rauda's involvement in purchasing the device and the cellular service.  He also specifically states that this particular device was purchased, with his money, for his "exclusive use."  That he chose to make this purchase through an intermediary, who in turn may have used an alias, may have been for nefarious purposes.  But the Fourth Amendment does not only protect the privacy interests of the honest and upright.  *See, e.g., United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (Although it is a fact-specific inquiry, "individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names.")

While Defendant may have taken steps to distance his name from the paperwork, he was in exclusive possession of this phone, had supplied the funds to purchase it, and at minimum had been granted exclusive custody and control of the phone by the co-purchaser (Alvarado).  These facts are sufficient to show Rauda's Fourth Amendment privacy interests vis-à-vis the device.  *See, e.g., United States v. Blake*, 868 F.3d 960, 969 n. 4 (11th Cir. 2017) ("Blake and Moore had a reasonable expectation of privacy in the password-locked iPad, which was owned by one of them, used by one or both of them, and kept inside the house they both

lived in."); *Villarreal*, 963 F.2d at 774-775 (finding that defendant had standing to challenge search of packages mailed to another, false, name, where the evidence showed that the defendant were the immediate and intended recipients and possessed the receipt to accept delivery).

### 2. *Franks* Challenge

#### a. Alleged Falsities

The Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978) explained that false statements filed in support of a search warrant can require suppression of evidence obtained. But to obtain such relief, a Defendant bears the burden to show two elements. First, the Defendant must prove "deliberate falsehood or of reckless disregard for the truth," not just "negligence or innocent mistake . . . ." *Franks*, 438 U.S. at 171-72. Second, even in cases of deliberate falsehoods, suppression is not warranted unless "the remaining content is insufficient" to support the issuance of the warrant. *Id.* Suppression can result not just from the inclusion of affirmative false statements, but also from the intentional or reckless omission of facts. *See United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). However, "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir.1997).

Generally, the scienter of the affiant is the only question at issue. *Id.* False statements by a nongovernmental informant do not give rise to a *Franks* challenge, except insofar as the affiant deliberately or recklessly passed along false information. *Id.* However, where the affiant's knowledge is based on information reported by other law enforcement agents, any culpable scienter on the part of the reporting agents can be the basis of a *Franks* violation, even if the affiant personally was innocent. *See United States v. Davis*, 471 F.3d 938, 946-947 (8th Cir. 2006) (officer's false report that firearms were seen "in plain view" while conducting a protective sweep of a premises, when in fact the officer broke into a locked closet to observe those firearms, was relied upon by another officer in swearing out a warrant application, and could have been a basis of a *Franks* challenge regardless of the scienter of the applicant officer; suppression was ultimately denied on grounds that the statement was immaterial).

It is undisputed that Investigator Saunders' affidavit in support of his April 30, 2018 geolocational search warrant application contained inaccuracies. In recounting the information supposedly provided by HSI's CI, Saunders stated that "the location for [the buyer] to get the 5 kilograms of heroin was 230 Grayland Court, in Lawrenceville, a city in Gwinnett County, Georgia," and that "the CI also stated that a shipment of approximately twenty kilograms (20 Kg) is supposed to arrive at the same address of 230 Grayland Court in Lawrenceville." [64-1] at 4.

In fact, it is undisputed that the CI never told HSI agents that the transactions would take place at 230 Grayland Court.  What the CI said, rather, was that the narcotics would be received by the same group of traffickers that he had previously identified, including the user of the Prior Phone.  While the agents had tied this drug trafficking group to 230 Grayland Court, based in part on tracking the Prior Phone, the CI never expressed identified that location.

In addition to these express inaccuracies, Defendant also argues that the warrant application included material omissions.  Specifically, Defendant argues that the officers purposefully hid from Judge Hutchinson the allegedly uneventful surveillance of 230 Grayland Court, and the failure to find evidence of active drug trafficking activities in two stops of vehicles leaving 230 Grayland Court. Defendant argues that inclusion of such exculpatory facts would have destroyed any conclusion of criminal activity at 230 Grayland Court and/or fatally undermined the reliability of the CI. [2]

---

[2] Defendant in his post-hearing briefing does not rely on Sauders's statement in the affidavit that the transaction was anticipated within "eight days" as an express falsity justifying suppression.  As S/A Ledgerwood testified at the hearing, what the CI more precisely said was that the transaction would be within "8-14 days." *See* [99] at 42.  The Court will address this statement in more detail with regard to Defendant Dominguez's motion, below.  In sum, as explained below, even if Rauda had persisted in asserting this statement as a ground for *Franks* relief, the Court finds that the difference between "eight" and "8-14" days, and even the inclusion of an express time frame at all, was immaterial to probable cause.

b.    Materiality

Taking the two-step *Franks* inquiry in reverse order, the Court first reviews

the affidavit with the false statements excised, to determine whether "the

remaining content is insufficient" to support the issuance of the warrant. *Franks*,

438 U.S. at 171-72. In doing so, the Court therefore disregards all the references in

the affidavit to the CI reporting 230 Grayland Court as the location of the

anticipated deal.

The Government points out that the address itself was not necessary to

establish probable cause of a drug transaction, as the proposed premises to be

searched was a cell phone's locational data, not 230 Grayland Court itself. The

remaining information in the affidavit established that a CI, who had previously

given reliable narcotics-related information, stated that a substantial heroin

transaction would occur, involving a group that the CI was personally involved

with, and that the user of the Subject Phone would pick up a portion of that heroin

shipment. These facts remained sufficient, according to the Government, to

establish probable cause of criminal activity that would justify issuance of the

geolocational warrant relating to the Subject Phone.

The Court does not recommend upholding the warrant on this basis. Judge

Hutchinson did not simply find that criminal activity was occurring, and that

evidence would be found in the locational data for the Subject Phone. Rather, his

probable cause finding was more narrow: "[t]here is probable cause that, ***within Gwinnett County***, the above described crime/offense is being committed." [64-2] at 2 (emphasis added). The only references in Investigator Saunders' affidavit to activity within Gwinnett County are the false statements that the Court must excise in undertaking its *Franks* review. The remaining statements in the affidavit would not have justified the necessary probable cause findings to issue the warrant—that there was criminal activity *within Gwinnett County*. Thus, it follows that "the remaining content is insufficient" to support the issuance of the warrant. *Franks*, 438 U.S. at 171-72.

Although not included in Investigator Saunders' affidavit, the evidentiary hearing established additional facts to explain the agents' focus on 230 Grayland Court. The CI did not expressly identify the address, but the agents had come to focus on this address as a likely center of activity for the drug trafficking group identified by the CI based on other facts developed in their investigation.

But while these considerations may be relevant to the separate question of scienter, "[t]he fact that probable cause did exist and could have been established by a truthful affidavit does not cure the error." *United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983). In other words, in assessing the materiality of the affirmative false statements, the Court must simply excise those statements from the affidavit, and not cure them or replace them with corrected information. *See,*

*e.g., United States v. Harris*, 464 F.3d 733, 738–39 (7th Cir. 2006) ("Considering new information presented in the supplemental filing that supported a finding of probable cause was beyond the trial court's analytical reach. Rather, its consideration of new information omitted from the warrant affidavit should have been limited to facts that did not support a finding of probable cause. Allowing the government to bolster the magistrate's probable cause determination through post-hoc filings does not satisfy the Fourth Amendment concerns addressed in Franks."); *see also United States v. Yusuf*, 461 F.3d 374, 387 n. 11 (3d Cir. 2006). Thus, the affirmative false statements as to the Grayland Court in the affidavit were material to the issuance of the warrant, satisfying the second prong of *Franks*.

The Court, however, does not find that the agents' *omission* of other information about the surveillance of Grayland Court was material.  In other words, the Court does not find that any probable cause that otherwise existed would have been destroyed by the inclusion of the additional information as to the investigation into Grayland Court between April 6th and April 30th.  To the contrary, ironically, had the accurate facts been fully included in the affidavit, Judge Hutchinson would likely have found probable cause of criminal activity "within Gwinnett County."

First, a CI who had provided accurate information over the previous year, which resulted in successful substantial seizures of drug proceeds, provided a tip

that a group in the Atlanta area was receiving loads of narcotics from Mexico, and he/she provided a specific telephone number (the Prior Phone) being used by this group. The CI described himself/herself as a "middleman" personally working directly with this group in drug trafficking activities. This tip in itself would have likely supplied probable cause of drug activity. After all, an informer's tip is sufficient for probable cause so long as the affidavit explains the informer's basis of knowledge (here, the CI's role as "middleman" personally working with this trafficking group) and provides facts to suggest his or her reliability (here, the successful use of the CI's information over the past year. *See United States v. Brundidge*, 170 F.3d 1350 (11th Cir. 1999).

Second, geolocational information from the Prior Phone—as authorized by a prior Coweta County warrant not at issue in this motion—placed the Prior Phone as principally located in the 230 Grayland Court residence. The combination of this information itself would likely be sufficient for probable cause for Judge Hutchinson to issue this warrant.

The Eleventh Circuit has made clear that there is no requirement that the police corroborate information from a reliable CI, who has a concrete basis of knowledge. *Id*. Nevertheless, the record includes circumstantial facts at least somewhat corroborative of the tip. While a single traffic stop of a car being driven by the occupants of Grayland Court did not reveal any drugs or proceeds, the stop

confirmed that at least one individual in the car had a prior drug-related conviction, and that the occupants were en route to meet another individual who also had a drug-related conviction.  Also, agents from DEA had observed individuals from Grayland Court engaged in a transaction to buy or sell a "trap" vehicle for apparent smuggling use.  Moreover, Investigator Saunders explained that 230 Grayland Court is in an area of high drug activity.  None of this information was clear proof of illegal activity.  But the information was consistent with the CI's tips, and therefore further contributed to probable cause.  *See Illinois v.Gates*, 462 U.S. 213 (1983) (even in the case of an anonymous tip of criminal activity (i.e., not from a reliable CI) it was sufficient for the police to corroborate some circumstantial details that were consistent with the tip, even without actually confirming any criminal activity).

That Investigator Saunders did not happen to personally observe criminal activity or anything overtly suspicious at 230 Grayland Court during his two surveillance trips, or other brief drive-bys, did not add to probable cause.  But the mere lack of results from a few limited observations of the exterior of the house, over just a few days or weeks, would not have destroyed it either.  The same is true with the uneventful stop of what turned out to just be an Uber car leaving the residence on one occasion.  Indeed, the agents explained that after they began following that car they realized, from the "ping" data, that the user of the Prior

Phone was still at Grayland Court.  There were no facts developed at the hearing to suggest any reason to believe that this Uber car itself was affiliated with the residents other than it may have dropped one off or picked one up.  Thus, that a subsequent stop of this apparently unrelated third party's car yielded no evidence of drugs was not itself significantly probative one way or the other as to the suspicions of activity at Grayland Court.

At most, had Judge Hutchinson been supplied with a detailed affidavit that laid out the entire history of the investigation into Grayland Court from April 6th through April 30th, he would have seen a mix of information, some of which was consistent with the CI's tip, some which was also consistent with innocent activity, and none of which was definitive.  Supplying all of this information would not have deprived the affidavit of establishing probable cause of drug activity by the group, within Gwinnett County.

To be sure, S/A Ledgerwood acknowledged at the evidentiary hearing that there had been indications at some unstated time that the residents of Grayland Court might be moving, and HSI had identified another apartment also apparently associated with the group.  Tr. at 51, 61.  The evidence did not reveal that this other potential location was outside of Gwinnett County, and no specifics were adduced by the Defendant as to the status of the Grayland Court location as of April 30th.  It remains that Grayland Court was the location of the majority of the

"pings" from the Prior Phone in the weeks prior to the April 30th warrant and was where at least one member of the group was residing per the driver's license information furnished in the Macon traffic stop.

Thus, the "omitted" data as a whole still contained sufficient facts to justify probable cause that the group's drug trafficking activities were occurring "within Gwinnett County," or at least Defendant did not adduce facts to prove otherwise. After all, "probable cause" is a flexible, common-sense standard, that "merely requires that the facts available to the officer would 'warrant a [person] of reasonable caution in the belief.'" *Texas v. Brown*, 460 U.S. 730 "It does not demand any showing that such a belief be correct or more likely true than false." *Id.* Defendant does not show that a complete and truthful affidavit would have failed to meet this relatively low evidentiary standard to justify a data search for the Subject Phone.

Nevertheless, as explained above, the Defendant has satisfied his burden under *Franks*, to show at lease some affirmative false statements in the affidavit that cannot be excised without fatal undermining the judge's finding of probable cause. Thus, the analysis turns back to the first prong of the *Franks* analysis, by which the Defendant must prove that the false statements were made with the requisite scienter.

c.    Scienter

On this record, the Court simply cannot find any intent to mislead Judge Hutchinson.  Notably, there were layers of verbal communication separating the original source of the information (the CI) and the affiant.  The affiant lacked any personal knowledge of what the CI said, and instead relied on a telephonic report or summary from the case agent.  And there is no evidence that the case agent reviewed or was aware of the precise wording of the affidavit.  It is of course possible that one or both of the officers was lying to the other one, or that they both conspired to include a false statement in the affidavit.  But it is at least just as possible that all of this was a basic game-of-telephone problem by which the information ended up being garbled and/or misunderstood, and relatively slightly at that.

Indeed, the most probable conclusion from this record is that the mistake was unintentional.  The statements identifying Grayland Court did not relate to the core issue of whether criminal activity was afoot involving the Subject Phone.  230 Grayland Court, after all, was not the premises proposed to be searched.  The false statements, rather, were necessary only as to the somewhat more esoteric issue of venue.  And there was little reason to lie about the CI identifying Grayland Court in order to justify venue.  As explained above, the true investigative facts would have likely supported probable cause that the drug trafficking group identified by

the CI was operating at least in part out of Grayland Court and, thus, "within Gwinnett County."

Even if not, confirming some basis of venue for a superior court judge to issue a warrant would not seem on this record to be a difficult investigative task. For example, an ordinary subpoena or court order would have presumably revealed subscriber information for the Subject Phone in short order. The agents had also obtained a variety of information as to the residents of Grayland Court, including the identities and drivers' license information of individuals, and even identified another apartment possibly linked to them. Whether these facts pointed to conduct within Gwinnett or Dekalb County, or both, Defendant points to no reason why the agents would perceive the question of venue to be a significant hurdle to overcome in obtaining a warrant.

The addition of the address was also not necessary to "bolster" the reliability of the CI. The affidavit already established sufficient facts as to the CI, including the CI's concrete basis of knowledge (his or her direct involvement as middleman in this group), his or her knowledge of specific phone numbers and at least some details of an upcoming transaction, and the fact that he or she provided reliable information in the past that led to substantial cash seizures. Probable cause did not require the additional detail of the address.

Moreover, the differences between what S/A Ledgerwood knew and what Investigator Saunders stated were narrow.  HSI had, in fact, identified Grayland Court as being associated with the CI's trafficking group.  HSI did so not based on the CI's statements alone (as Saunders stated), but by using the CI's statements as lead that revealed other facts.  It is not difficult to imagine how carelessness in communication on the part of one or both officers could have led to these facts being mistakenly conflated.  In the end, it is simply unlikely that any rational officers would choose to lie about this relatively tangential detail, when they had sufficient true facts at their disposal to establish probable cause.

That HSI was a go-between for the CI and the affiant increased the risks of a communications mistake.  In retrospect, it would have been better for the HSI agents to have gotten the warrant themselves, as they did with a subsequent search warrant involving the truck.  But the Court cannot ascribe nefarious intent based on the mere coordination between HSI and local police.  Law enforcement agencies with overlapping jurisdictions routinely cooperate and share information.  Thus, while in retrospect S/A Ledgerwood could have pursued a federal warrant from the beginning of this operation, the fact that he did not is not in itself evidence of fraud.

None of this is to suggest that the events of April 30 represented good police work.  It may have been careless to make and/or allow such a mistake.  But

careless and negligent mistakes in affidavits do not justify suppression. *See Franks*, 438 U.S. at 171-172 ("Allegations of negligence or innocent mistake are insufficient."). It is dispositive that the Court cannot find that the facts represent *dishonest* police work. Nor can the Court find circumstances rising to the high level of reckless disregard for the truth. "The distinction among such categories as 'negligence,' 'reckless or callous indifference,' and 'intentional' conduct can be elusive. According to general tort principles, however, a central distinction among these categories involves the actor's degree of certainty that negative consequences will result from his act or omission." *Germany v. Vance*, 868 F.2d 9, 18 n.10 (1st Cir. 1989). Here, there is no indication that either officer was aware of and ignored the probable falsity of the statements or persisted despite serious reasons to harbor doubts as to their accuracy. Indeed, the evidence does not show that S/A Ledgerwood was even aware, at the time, of the wording of the affidavit. Perhaps he should have reviewed the draft, or Investigator Saunders should have verified it with S/A Ledgerwood. But those considerations quintessentially sound in a *negligence* inquiry. Merely failing to take sufficient care is not reckless disregard. Suppression on grounds of *Franks* should be denied.[3]

---

[3] The Court **GRANTS** the Government's Motion for Leave to File Excess Pages [108], which requests permission to file a 13-page post-hearing brief as opposed to a 10-page brief. This motion has not been opposed, and the Defendant had the opportunity to and did file a reply afterwards [111]. The Defendant's reply did not

### 3. *The Gwinnett Court's Jurisdiction*

Defendant Rauda also argues that Judge Hutchinson exceeded his authority under state law in issuing this warrant and that the warrant should be declared "void *ab initio*."  Defendant argues that the Georgia code does not authorize warrants for geolocational cellphone data, or at least warrants for data relating to a phone outside the Judge's particular county.

### a. Statutory Challenges To A Warrant

While the ultimate touchstone of any warrant consideration is the Fourth Amendment itself, the Courts must also follow the relevant rules and statutes passed by applicable legislative bodies relating to warrant procedures. Nevertheless, not all violations of legislatively-imposed rules justify the remedy of suppression.  To determine whether suppression is warranted, a reviewing court must first decide whether the statutory violation is a "fundamental error[ ]" or a "mere technical error[ ]." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992).  Fundamental errors are those that "result in ... constitutional violations," and they generally do require suppression, absent good faith. *Id.* By contrast, non-fundamental, merely technical errors require suppression only if the defendant can show either that (1) he was prejudiced by the error, or (2) there is

---

use all of the pages that he was allotted, suggesting that he has not been prejudiced by the Government's use of a few extra pages.

evidence of "deliberate disregard of the rule." *Id.*; *United States v. Henderson*, 906 F.3d 1109, 1114-1115 (9th Cir. 2018).

The Government does not argue that the alleged statutory errors in this case were merely technical.  Indeed, Plaintiff raises challenges to the Judge's legal authority or jurisdiction to consider this warrant.  The Court therefore assumes this challenge to qualify as a claim of "fundamental" error.  *See, e.g., Henderson*, 906 F.3d at 1114-1115 (a warrant that authorized collection of electronic data outside of the Magistrate Judge's judicial district violated the venue provision of Fed. R. Crim. P. 41(b), was void *ab initio*, and would have triggered suppression had the agents not been justified in relying on the warrant in good faith).

However, any second-guessing of a Judge's statutory jurisdiction to issue a warrant necessarily bumps into another basic principle of Fourth Amendment jurisprudence, that is, good faith reliance.  Under the "good-faith exception" set forth by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984), where officers have an objective basis to rely in good faith on a facially valid warrant, the evidence secured thereunder should not be excluded even if the warrant ultimately turns out to be defective.  As the Court explained in *Henderson*, the good faith reliance exception applies even to jurisdictional deficiencies that might render a warrant "void *ab initio*."  *Henderson*, 906 F.3d at 1118-1119.

Only in four specific situations is the good-faith exception inapplicable: (1) where the issuing magistrate or judge was misled by information in an affidavit that the affiant knew was false or, except for reckless disregard for the truth, should have known was false; (2) where the judicial officer that issued the warrant "wholly abandoned his judicial role;" (3) where the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant issued is "so facially deficient... that the executing officers cannot reasonably presume it to be valid." *Id.*, 468 U.S. at 923.

"Good faith" is an objective standard determined by what a reasonable police officer under the circumstances would perceive, not what a judge or other legal expert would perceive. *United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990). In other words, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916, 919. The Government bears the burden to demonstrate the applicability of the *Leon* good faith exception. *United States v. Robinson*, 336 F.3d 1293, 1297-98 (11th Cir. 2003).

b.  Authority To Issue Warrants For Geolocational Data

Most basically, Defendant argues that the warrant is void because no Georgia statute expressly authorizes the real-time prospective collection of

geolocational data from a cell phone.  Defendant appears to concede that the federal courts can issue such warrants, at least under the federal tracking device statute, 18 U.S.C. § 3117.  But Defendant argues that there is no analog to this statute in the Georgia code, or any other statute that authorizes collection of this data, and that no other Georgia statutes dealing with interception or collection of communications-related data apply as a matter of law.  Specifically, Defendant argues at length that a cell phone geolocational "ping" warrant cannot be authorized under the Georgia Surveillance Statute, O.C.G.A. §§ 16-11-60, *et seq.*, or under various provisions that allow for wiretaps, collection of stored communications and subscription information, or pen registers or traps and traces. *See* Pl. Br. [64] at 11-17.

The Government cites the generally-applicable search warrant statute, O.C.G.A. § 17-5-21(a)(5), which broadly permits courts to issue warrants for the seizure of "any instruments, articles, or things, ***any information or data***, and anything that is tangible or intangible, corporeal or incorporeal, visible or invisible evidence of the commission of the crime for which the probable cause is shown, other than the private papers of any person." (emphasis added).  The Government argues that the phrase "any information or data" plainly covers geolocational data from cellular phones.

The warrant application and the warrant itself refer on their face to the search warrant statute, O.C.G.A. § 17-5-20, *et seq*.  [65-1] at 1.  Nevertheless, the specific header referring to "Geolocation/Cell Site/ Tower Location" includes a parenthetical citation to a federal statute, the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. §§ 1001, 1002.  *Id.* at 5.  Defendant argues, and the Government does not dispute, that CALEA does not itself authorize any court to collect geolocational data.   Rather, the general purpose of CALEA is to require technical assistance and cooperation in the execution of otherwise lawful warrants and other process.  *See generally H.R. Rep. 103–827(I)*, 103d Cong., 2d Sess. at 9 (October 4, 1994) (CALEA "preserve[s] the Government's ability, pursuant to court order or other lawful authorization, to intercept communications involving advanced technologies such as digital or wireless transmission modes, or features and services such as call forwarding, speed dialing and conference calling, while protecting the privacy of communications and without impeding the introduction of new technologies, features and services*."*).

The Court agrees that a geolocational "ping" warrant is authorized, perhaps among other sources of authority, at least by the general provisions of Georgia's search warrant statute.  This statute very broadly authorizes warrants for collection of "any information or data."  O.C.G.A. § 17-5-21(a)(5).  Nothing in the language

of the statute, nor in any precedent cited by Defendant, restricts the scope of this language to only historical locational data, as opposed to prospective, real-time data.  Much the opposite, the statute specially allows collection of "any" information or data, which if anything suggests no limitation.  Even if there were some question in this regard, the language objectively justifies good faith reliance by the police on a warrant for such data.  Indeed, notably, Defendant cites no judicial decision finding any Georgia court to lack authority to issue a warrant for collection of geolocational data, upon a showing of probable cause.

The reference to CALEA on the face of the warrant is confusing. Nevertheless, the Court does not conclude that this citation is listed as the basis, or at least sole basis, of Judge Hutchinson's authority.  Indeed, as noted above, the warrant specifically cites the general search warrant statute.  In any event, mere confusion or even mistakes in a statutory citation in a warrant otherwise supported by law and probable cause is not a basis for suppression.  Thus, the Court rejects the argument that suppression is warranted because "Georgia law does not currently authorize the conversion of a cellular telephone into a tracking device for surveillance purposes."  Def. Br. [64] at 2.

c.  Geographical Restrictions For Geolocational Data Warrants

Defendant makes the related but separate point that, even if a Superior Court Judge could generally issue a geolocational cell phone warrant, Judge Hutchison

could not authorize a tracking device or otherwise allow collection of data in this case, where the phone turned out to be outside of Gwinnett County for much of the monitoring.  Analogizing to a tracking device warrant, Defendant points out that the federal tracking device statute only permits a judge to authorize installation of a device "within the jurisdiction of the court."  18 U.S.C. § 3117.  Defendant also cites case law for the proposition that "[i]n Georgia, the territorial jurisdiction of a judge of the superior courts is the judicial circuit in which he presides."  Def. Br. [64] at 10 (quoting *Luangkhot v. State*, 736 S.E.2d 397 (Ga. 2013)).

Defendant points out that, in *Luangkhot*, the Georgia Supreme Court found that a Superior Court Judge lacked authority under the Georgia wiretap statute (O.C.G.A. § 16-11-64) to authorize interceptions, where neither the tapped phones nor the law enforcement listening post were within the Judge's county.  *Luangkhot*, 736 S.E.2d at 398-399.  While the Georgia legislature subsequently amended the wiretap statute, to allow Superior Court judges to authorize interception of calls anywhere within the state, Defendant points out that such legislative clarification has never been issued for tracking device or ordinary search warrants.  Thus, according to Defendant, there was nothing to permit Judge Hutchinson to allow a search for geolocational data relating to a cellular phone that turned out to be located in Dekalb County, not Gwinnett County.  At a minimum, according to Defendant, the police were obligated to cease relying on this warrant, and perhaps

obtain another warrant in Dekalb County, once it became clear that the phone was not located in Gwinnett County at the inception of tracking.

The Government argues that this warrant was not a "tracking device" warrant *per se*, and did not need to specifically comply with the venue rules of any federal statute.  Rather, the Government again argues that the warrant was authorized under state law, as one for "information or data" under O.C.G.A. § 17-5-21(a)(5).  The Government points out that this statute does not include any express venue restriction.  Further, every Georgia statute that involves collection of specific categories of electronically stored or transmitted communications or related data includes at least *statewide* authority for issuing judges, including for wiretaps, pen registers and trap and traces, and records relating to stored electronic communications.  The Government argues that the venue authority for issuing geolocational warrants should be interpreted in the context of this comprehensive statutory scheme, which recognizes that electronic data and communications may not always stay within the boundaries of a particular Georgia county.

The Court agrees that the venue provisions of the federal tracking device statute, 18 U.S.C. § 3117, and/or Fed.R.Civ.P. 41, did not limit the Gwinnett Court's jurisdiction to issue this warrant.  Most fundamentally, these federal requirements did not apply to the procedures of the state court which issued this warrant.  Moreover, many courts have found that the collection of geolocational

records from a telecommunications provider is materially distinguishable from the "installation" by law enforcement of a tracking "device," at least for purposes of applying a venue restriction.  *See, e.g., In re Smartphone Geolocational Data Application*, 977 F.Supp. 2d 129, 149-150 (E.D.N.Y. 2013) ("I find that gathering geolocation information about a cellular telephone does not convert the phone into a 'tracking device' for the purpose of the statute.")  While there may be some disagreement in the caselaw as to the applicability of the tracking device statute to geolocational cell phone warrants, Defendant cites no controlling authority (and the undersigned is aware of none), or any authority in Georgia at all, finding the venue provision of 18 U.S.C. § 3117 to limit the issuance of a warrant for such data.  Given the uncertain state of the law on this question, and the lack of controlling authority, the geolocational warrant cannot be said to be so facially illegal so as to deprive reasonable officers of any good faith reliance, based solely on analogy to the venue rules of the tracking device statute.

Defendant argues that suppression is required in any event because no other statute allowed for a Georgia Superior Court to issue a warrant for collection geolocational information from a phone located in another county.  But, again, the Georgia search warrant statute very broadly allows for a warrant to seize "***any*** information or data."  O.C.G.A. § 17-5-21(a)(5) (emphasis added).

Of course, as a general matter, the jurisdiction of the Superior Courts extends only within their particular counties.  But Defendant cites no authority applying this concept to a geolocational data warrant.  Such warrants pose unique questions, which have largely not been answered by governing appellate courts, as to how a geographical restriction would be imposed.  As noted above, a geolocational warrant is not a search of a phone directly, but rather constitutes legal process to obtain the records of a telecommunications company.  Notably, the statutes that deal most directly with obtaining records or other information from telecommunications providers—18 U.S.C. § 2703 and its Georgia analog, O.C.G.A. § 16-11-66.1—include very broad venue provisions, that are arguably broader than the Georgia wiretap statute originally considered by *Luangkhot*.

Section 2703 allows any court of "competent jurisdiction"—defined as including any judge with jurisdiction over the crime being investigated, 18 U.S.C. § 2510(9)—to issue a warrant to a telecommunications provider for "records or other information" relating to a subscriber, no matter where those records are located.  18 U.S.C. § 2703(c)(1)-(2).  Courts have found that these statutory provisions authorize federal courts to issue geolocational "ping" warrants for cellphones regardless of where the phone may be located—so long as the court has jurisdiction over the investigation.  *See, e.g., United States v. Gutierrez*, 2018 WL 6579409, *6 (M.D. Fla. 2018).  Yet again, Defendant does not cite, and the Court

is aware of no Georgia or other cases analyzing this question as a matter of Georgia law, or any other cases from the Eleventh Circuit or this District.  But, notably, the Georgia's Stored Communications Act, O.C.G.A. § 16-11-66.1, expressly applies "to the extent and under the procedures and conditions provided for by the laws of the United States," including § 2703.

Defendant's principal citation, *Luangkhot*, 736 S.E.2d at 398-399, is distinguishable.  Most basically, *Luangkhot* addressed a different statutory regime, that is, the interrelated set of federal and state statutes specifically dealing with wiretap authority.  Moreover, the restrictive geographical standard set forth in *Luangkhot* has been reversed by subsequent statute.  While Defendant argues that no such statutory modification has been allowed for geolocational data warrants, this question also is at least arguable.  As explained above, some courts have found broad authorization to obtain telecommunications records via warrant under § 2703, which standards are arguably adopted and apply to the same extent under the Georgia analog statute.  In other words, the statutory modification that was necessary for wiretap authority after *Luangkhot* was arguably unnecessary for geolocational records, because that authority already exists.  And all of these statutes at least arguably evince a legislative intention to allow Superior Court Judges to authorize the receipt of mobile device data based on the location of the criminal activity, not necessarily the device itself.

Given this uncertainty, and at least debatable authority for obtaining geolocational data without strict regard for the location of the phone, the police would have had an objectively reasonable basis to rely in good faith on this warrant. Even if the Court were to accept Defendant's legal arguments and declare new law as to the geographical restrictions of geolocational data warrants under Georgia state law, doing so would only "punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916, 919. The police in this case were not required to predict future legal decisions on these at least ambiguous questions and second-guess Judge Hutchinson's decision to authorize the warrant.

Defendant separately suggests that the officers misled Judge Hutchinson as to the Subject Phone's location within Gwinnett County, and that they should have immediately stopped relying on the warrant when the results showed that the phone was instead within Dekalb County. This argument is meritless. The affidavit did not provide any indication as to where the Subject Phone was or would be located, or assurance that it was within or would stay within Gwinnett County. The affidavit, to the contrary, stated that the user/subscriber of the Subject Phone and his or her address was "unknown." [64-1] at 1.

Judge Hutchinson did not find otherwise. What Judge Hutchinson found was that there was probable cause of criminal activity within his jurisdiction (Gwinnett County). But he made no specific findings as to the location of the

Subject Phone.  He merely stated that the device was or would be evidence of the criminal activity.  The warrant was therefore not issued based on any representation or finding as to the location of the phone itself, which Judge Hutchinson apparently did not feel was necessary to issue the warrant.[4]   Nor would it have been inconsistent or particularly surprising for the data to reveal that the Subject Phone (held by the buyer) happened to be located in an immediately neighboring county, close by the location of the sellers at or around Grayland Court.  The officers were therefore entitled to rely on this warrant without having provided any facts regarding the location of the Subject Phone or Judge Hutchinson having made any findings as to its location.

*     *     *     *

Thus, Defendant Rauda's Motion to Suppress Evidence [64] should be **DENIED**.

---

[4] For the reasons described at length above, the Court likewise does not find that the officers lacked a good faith basis to rely on the warrant because of the inaccuracies in Investigator Saunders's affidavit.  As explained above, the Court concludes that these errors were the result of negligent mistakes but not intentional and reckless conduct.  Moreover, as explained above, these alleged false statements did not relate to the location of the Subject Phone as of April 30th.

II.   **DEFENDANT DOMINGUEZ'S MOTION TO SUPPRESS A VEHICLE SEARCH [65]**

Defendant Dominguez separately moves to suppress the results of a search of a truck that was parked in his driveway, pursuant to a federal warrant issued on May 11, 2018.  Dominguez argues that this warrant should be suppressed as "fruit of the poisonous tree," since probable cause as to the truck would never have been established but for the allegedly illegal geolocational warrant as to Rauda's phone.  Moreover, Dominguez argues that suppression is independently warranted because of other alleged false statements and omissions in the federal application.  This motion is meritless and should be denied.

A. *Background*

On May 11, 2018, approximately two weeks after Investigator Saunders obtained the geolocational warrant for Defendant Rauda's phone, S/A Ledgerwood applied for and received a warrant to search "a green Ford pick-up truck with Georgia license plate number RIM4131," which was then currently parked at 1907 Cades Cove, Jonesboro, Georgia.  [65-2] at 1, [65-3] at 1.  The truck was not registered to Defendant Dominguez, and Defendant Dominguez claims no ownership or other interest in the truck.  However, Defendant Dominguez claims that he resided at the location where the truck was parked—1907 Cades Cove— with other family members.

In his affidavit, S/A Ledgerwood stated:

On April 30, 2018, a HSI CI "told me [i.e., Ledgerwood] that a person using a T-Mobile telephone number 404-438-3328 ('Subject Telephone') was going to receive a shipment of narcotics from Mexico, which would include five kilograms of heroin in the next two weeks." Ledgerwood Aff. [65-2] ¶ 12.[5]  S/A Ledgerwood explained that GPS data for the Subject Telephone obtained pursuant to Judge Hutchinson's warrant revealed that the user stayed primarily at a house on S. Hairston Road in Decatur, Georgia. *Id*. ¶ 13.  On May 10, 2018, surveillance revealed that a male and female left the Decatur residence in the green Ford pickup truck (the "Target Vehicle") and travelled to a farm. *Id.* ¶ 14.  GPS data placed the Subject Telephone at the farm. *Id*.  The Target Vehicle and (according to the GPS data) the Subject Telephone both then traveled to Defendant Dominguez's Cades Cove residence. *Id*.

The Target Vehicle left Cades Cove at approximately 7:30 pm. *Id*. ¶ 15. Agents were unable to maintain visual surveillance, but by tracked it via the Subject Telephone to a pallet supply company in College Park, Georgia. *Id*. ¶ 16. S/A Ledgerwood observed that this business was closed, but that the Target Vehicle was parked in the back alongside a blue Freightliner bobtail truck. *Id*.

---

[5] Consistent with his testimony in the evidentiary hearing as to the information he provided Investigator Saunders, S/A Ledgerwood in his federal affidavit did not state that the location of the drug transaction was going to be 230 Grayland Court.

S/A Ledgerwood observed a forklift load three white plastic 55-gallon barrels onto the Target Vehicle, and then replace the truck cover. *Id.* Other agents followed the Target Vehicle back to Cades Cove, and S/A Ledgerwood followed the Freightliner to an empty parking lot. *Id.* ¶ 17. S/A Ledgerwood observed the driver of the Freightliner (later identified as co-Defendant Fuentes) meet with the driver of a black Lincoln Navigator in the parking lot. *Id.* The Navigator was registered to "Nigeria Green" at the 1907 Cades Cove address. *Id.* GPS data placed the Subject Telephone at this time in the parking lot, presumably within the Navigator. *Id.*

Subsequently, after the Freightliner left the premises, it became disabled on the road, and Georgia State Patrol units responded. *Id.* ¶ 20. After issuing unrelated citations, the GSP asked for and received permission from Fuentes to search the Freightliner. *Id.* ¶¶ 20-21. Among other things, after Fuentes provided what he claimed was his only phone, the officers found a black bag that contained six rubber banded bundles of U.S. currency and another small black telephone. *Id.* The phone that Fuentes had in the black bag revealed communications with the Subject Telephone, as well as with Mexican telephone numbers. *Id.* ¶¶ 22-23. A certified K-9 drug sniffing dog alerted to the presence of narcotics on the currency. *Id.* ¶ 25.

On the basis of these facts, S/A Ledgerwood asked for permission to seize and search the Target Vehicle, and for permission to enter the premises of Cades Cove to access the vehicle.

**B.** *Discussion*

1. Standing

As described above regarding Defendant Rauda's standing, the party seeking to invoke the protection of the Fourth Amendment bears the burden to prove the facts to show his or her standing. *See Robinson*, 62 F.3d at 1328. In cases involving the Fourth Amendment, defendants only have standing where they have a reasonable expectation of privacy in the area searched or the evidence seized. *See Minn. v. Carter*, 525 U.S. 83, 91 (1998) (defendant who was a short-term guest of a commercial establishment lacked a reasonable expectation of privacy, and therefore standing to contest drug evidence seized on the premises). To properly allege standing, two conditions must be met before the Court finds that the expectation of privacy is reasonable or justifiable: "(1) an actual or subjective expectation by the defendant; and (2) the expectation is one that 'society is prepared to recognize as reasonable.'" *Hudson v. Palmer*, 468 U.S. 517, 525 (1984) (internal quotations and citations omitted).

Dominguez asserts no rights or privacy interests as to the Target Vehicle in itself. Indeed, the Target Vehicle was registered to another individual at another

address.  Although the Vehicle was apparently parked in the driveway of the house in which Dominguez lived, his affidavit supplies no facts to show that the truck was owned, used or borrowed by him, that he had any connection whatsoever to this truck, or that he even knew it was parked there.  Indeed, Dominguez's affidavit is entirely silent about the truck itself.  His entire theory of standing is that the officers accessed his driveway to seize the truck.

Whether a resident has a reasonable expectation of privacy in a driveway has been considered a fact-specific question.  "In order to establish a reasonable expectation of privacy in [a] driveway, [a movant] must support that expectation by detailing the special features of the driveway itself (i.e. enclosures, barriers, lack of visibility from the street) or the nature of activities performed upon it." *Maisano v. Welcher*, 940 F.2d 499, 503 (9th Cir. 1991).  The parties do not cite any governing 11th Circuit precedent on this question, but many courts have found no reasonable expectation of privacy in driveways absent a specific showing of facts.[6]

---

[6] *See United States v. Brown*, 510 F. 3d 57, 65 (1st Cir. 2007) (holding that when a driveway is exposed to public view it is not part of the home's curtilage protected by the Fourth Amendment); *United States v. Reyes*, 283 F.3d 446, 466-67) (2d Cir. 2002) (Defendant only had a "diminished" expectation of privacy, not sufficient to show any constitutional violation, to the extent the officers walked along Defendant's gravel driveway and observed marijuana plants in plain view); *United States v. Smith*, 783 F.2d 648, 649-50, 651, 652 (6th Cir.1986) (no reasonable expectation of privacy in driveway accessible and visible from public highway; officers permissibly drove seventy-five to one hundred yards up defendant's unobstructed driveway before applying for a state search warrant); *United States v. Evans*, 27 F.3d 1219, 1222-23, 1228-29 (7th Cir.1994) (no reasonable expectation

Two important recent Supreme Court decisions clarify these principles.  In

*Florida v. Jardines*, 569 U.S. 1, 9-10 (2013), the Court made clear that when a law

enforcement officer physically intrudes on the curtilage of a residence to gather

information, a search within the meaning of the Fourth Amendment has occurred.

*Id*. at 11.  Such an intrusion occurs even at the front door and porch of a house—

even if otherwise visible, and despite a traditional implied license for strangers to

approach such areas—when the police exceed the scope of any implied license to

be present.  *Id*.  In that case, the Court noted that officers could have permissibly

entered these protected areas to knock on the front door and speak with whoever

answered, at least until told to leave.  But the Court found that the officers crossed

---

of privacy absent evidence of limited access to driveway; officers permissibly
entered driveway in the course of following suspects); *United States v. Ventling*,
678 F.2d 63, 64, 66 (8th Cir.1982) (no reasonable expectation of privacy in
residential driveway accessible to and openly visible from public highway);
*Maisano v. Welcher*, 940 F.2d 499, 503 (9th Cir.1991) ("In order to establish a
reasonable expectation of privacy in [a] driveway, [movant] must support that
expectation by detailing the special features of the driveway itself (i.e. enclosures,
barriers, lack of visibility from the street) or the nature of activities performed
upon it."); *Cf. United States v. Gomez*, 276 F.3d 694, 697-698 (5th Cir. 2001)
(concluding that homeowner had both a subjective and objectively reasonable
expectation of privacy in a vehicle owned by a third party and parked in the
homeowner's driveway, but only on a specific evidentiary showing linking the
homeowner to the contents of the car in that case; "We do not speculate on whether
there would be standing in any other situation in which these factors were not
present."); *United States v. Wells*, 648 F.3d 671, 680-81 (8th Cir. 2011) (movant
had established a reasonable expectation of privacy in portion of unpaved driveway
that had passed around the side of the home to the back, and was not generally
visible or openly accessible to visitors).

the line into trespassing by having a drug-sniffing dog attempt to detect odors emanating from inside the house.  *Id*. at 9-10.  The Court made clear that the heightened privacy interests of a home extend to "the area 'immediately surrounding and associated with the home,'" even if its is otherwise visible to the street.  *Id*. at 9-11.  "As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so. He had not."  *Id*. at 8.

*Jardines* did not deal with the specific context of a driveway, although the Court made clear that an area is not disqualified as "curtilage" simply because it might be visible from the street.  The Supreme Court, however, directly applied this trespass-based analysis to the context of a driveway in the more recent case of *Collins v. Virginia*, __ U.S. __, 138 S.Ct. 1663, 1670-71.  In circumstances analogous in many ways to those here, the police entered a private driveway to search a motorcycle for which they had the authority to search, not (as here) pursuant to a warrant, but rather pursuant to the automobile exception to the warrant requirement.  The question confronting the Court in *Collins* was whether the area of the driveway in which the motorcycle was parked qualified as part of the house's curtilage, that is, part of the "area adjacent to the home and 'to which the activity of home life extends.'"  *Id*. at 1671 (*quoting Jardines*, 569 U.S. at 7).

The Court in *Collins* concluded that the portion of the driveway in which the motorcycle was parked qualified as curtilage. Thus, the Court found that the police violated the Fourth Amendment by intruding into this space, despite having a valid legal basis to otherwise search the motorcycle. *Id*. Notably, however, the Court reached these findings based on a fact-specific analysis of the driveway itself and the particular portion of the driveway in which the motorcycle was parked:

> As an initial matter, we decide whether the part of the driveway where Collins' motorcycle was parked and subsequently searched is curtilage. According to photographs in the record, the driveway runs alongside the front lawn and up a few yards past the front perimeter of the house. The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house. A side door provides direct access between this partially enclosed section of the driveway and the house. A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. When Officer Rhodes searched the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house.

*Id*. at 1670-71. Based on these specific facts, the Court concluded that the motorcycle was parked in an area analogous to "the front porch, side garden, or area 'outside the front window,'" which "constitutes 'an area adjacent to the home and to which the activity of home life extends,' and so is properly considered curtilage." *Id*. (*quoting Jardines*, 569 U.S. at 7) (internal quotations within *Jardines* omitted).

On the one hand, *Jardines* and *Collins* evince a strong, flexibly-applied principle to protect unlicensed trespasses into private property.  These cases also clearly show that even visible structures and areas can be afforded Fourth Amendment protection as "curtilage."

On the other hand, *Collins* clearly still suggests—as most pre-*Jardines* cases have found—that driveways are not automatically considered to be part of the constitutionally-protected curtilage.  The Court in *Collins* applied that protection to the specific area in which the motorcycle was parked in that case, only based on a factual showing, which included that the motorcycle was parked within a partial enclosure, and could only be accessed by walking away from the front entrance of the house and around the enclosure.

Defendant also cites *United States v. Dunn*, 480 U.S. 294 (1987) for the proposition that "[a]n unenclosed driveway, especially in a suburban neighborhood, can reasonably be considered an 'area around the home to which the activity of home life extends.'"  Def. Br. [78] at 3.  But *Dunn* also shows just how fact-specific of a showing Defendant must make.  Hardly involving a suburban neighborhood, *Dunn* involved a ½ mile long driveway past a locked gate and fence that ended up in a clearing where a residence and outbuildings were located. *Dunn*, 480 U.S. at 306.  The Court's analysis of the curtilage issue was based on an extensive discussion of the details of the physical layout of the property.  *Id*. at

300-302.   Ultimately, after discussing those details, the Court rejected the curtilage label as to the structures at issue in that case.  *Id*. at 305.

Defendant quotes the Court's statement in *Collins* rejecting an approach that "automatically would grant constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage."  Def. Br. [78] at 2-3.  But, in context, what the Court was rejecting by that statement was the bright-rule proposed by the State of Virginia, by which garages or other enclosed structures would automatically be deemed to be curtilage, and driveways would automatically be deemed not to be curtilage.  What *Collins* stands for, rather, is that a driveway *can* be curtilage, depending on the facts.  Those facts were presented in *Collins*.  No such facts are presented here. Defendant has supplied no facts whatsoever about the driveway at Cade Cove, or where the Subject Vehicle was parked.  Indeed, his minimal affidavit mentions neither the driveway nor the Vehicle at all.[7]

---

[7] Although the burden is not on the Government to refute standing, the Government has proffered photographic evidence to show that the Subject Vehicle was parked at the end of a wide-open and highly visible driveway, close to the street itself.  *See* [73-4][74-5].  This location is significantly distinguishable from the partially enclosed parking location around the side of the house considered in *Collins*.

Defendant cites various authorities for the non-controversial point that driveways "are frequently held to be within the curtilage of a residence."  [78] at 2. But that other cases based on specific facts have found driveways to be curtilage— or even that cases "frequently" do so—does not mean that driveways are automatically curtilage.  As explained above, *Dunn*, *Collins*, and the many other cases cited herein make clear that this is not the law.

Thus, Defendant has failed to show standing to contest the seizure and search of the Subject Vehicle.  His motion is subject to denial on that basis alone. Nevertheless, in the interests of completeness, the Court will proceed to consider the merits.  As explained below, even if Defendant were to have standing, his motion would still fail.

### 2.  Fruit of the Poisonous Tree

Defendant Dominguez first argues that if the Court finds the geolocational data search of Rauda's phone to be illegal, then the truck warrant should also be suppressed as a "fruit of the poisonous tree."  This phrase was coined by Justice Frankfurter to refer to secondary or derivative evidence that is tainted by a prior constitutional violation and which, in some circumstances, must also be suppressed.  *See Nardone v. United States*, 308 U.S. 338 (1939); *see also Wong Sun v. United States*, 371 U.S. 471 (1963).

In this case, the federal warrant application makes clear that the results of Judge Hutchinson's geolocational data warrant were critical in establishing probable cause to search the truck. The Government does not argue otherwise, that is, that the seizure and search of the Target Vehicle would have occurred, and that probable cause would have existed, absent the geolocational warrant.

Suppression is not warranted, however. First, obviously, as explained at great length above, the undersigned finds no constitutional violation vis-à-vis the issuance of the geolocational warrant. Thus, there is no poisonous tree in the first place. Second, regardless, Dominguez asserts no rights whatsoever in Rauda's telephone or location. Defendants "may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated." *United States v. Salvucci*, 448 U.S. 83, 85 (1980). Thus, a "defendant may not exclude evidence that has been 'come at by exploitation' of a violation of somebody else's rights." *United States v. Jarvi*, 537 F.3d 1256, 1260-61 (10th Cir. 2001) (police found drugs at Defendant A's residence pursuant to a warrant procured by using illegally-extracted statements obtained from Defendant B; the statements were suppressed as to Defendant B, but the results of the warrant

derived from those statements were not suppressed as to Defendant A, whose

rights were not violated by the extraction of those statements)[8].

For example, in the seminal case of *Wong Sun*, 371 U.S. at 471, the police

obtained illegal statements from one defendant (Toy), which then led the police to

a search that discovered drugs in the possession of a third-party (Yee).  The

Supreme Court suppressed the drugs as to Toy, even though he did not have a

personal right of privacy in the third-party's premises, because the search of those

premises was tainted by the original violation of Toy's rights.  *Id*. at 487-488.

However, the Court made clear that the taint created by the violation of Toy's

rights did not necessarily restrict the prosecution's ability to use the evidence as to

another defendant (Wong Sun):

> Our holding, supra, that this ounce of heroin was inadmissible against
> Toy does not compel a like result with respect to Wong Sun. The
> exclusion of the narcotics as to Toy was required solely by their tainted
> relationship to information unlawfully obtained from Toy, and not by
> any official impropriety connected with their surrender by Yee. The
> seizure of this heroin invaded no right of privacy of person or premises
> which would entitle Wong Sun to object to its use at his trial.

*Id.* at 491-492; *see also United States v. McConnell*, 500 F.2d 347 (5th Cir. 1974)

(Defendant McConnell lacked standing to invoke the fruit of the poisonous tree

---

[8] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding
precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209
(11th Cir. 1981) (en banc)

doctrine to suppress evidence resulting from an illegal search of Co-Defendant Byrd's car).

Thus, because Dominguez's rights were not violated by any illegality in the application or issuance of the geolocational warrant relating to Rauda's phone, no "poison" attaches to the use of that evidence against Dominguez.[9]

### 3. Dominguez's *Franks* Challenge

In addition to piggy-backing onto Rauda's challenges to the geolocational warrant, Defendant Dominguez separately argues that S/A Ledgerwood made other false statements and omissions justifying suppression in the warrant application for the truck.

Dominguez first points to the following affirmative false statement:

[T]he affiant claimed that the holder of the tracked cellular telephone device was expected to receive a shipment of five kilograms of heroin

---

[9] Defendant cites authority for the proposition that he does not need standing "regarding both the violation which constitutes the poisonous tree and separate standing regarding the evidence which constitutes the fruit of the poisonous tree." [65] at 3-4 (quoting *United States v. Gordon*, 346 F.Supp.3d 999, 1005 (E.D. Mich. 2018)).  This principle, however, is consistent with *Wong Sun* and other authorities discussed above.  In *Gordon*, the Defendant (Gordon)'s own rights were violated, as he was subjected to an illegal search of his hotel room.  Subsequently, as a result of the illegal search, a third-party surrendered a cellular phone to the police.  The Court found that the cellphone qualified as "derivative" evidence resulting from the original breach and was subject to potential exclusion in the trial *as against Gordon*.  Much like *Wong Sun*, this holding does not assist Dominguez's request to suppress evidence allegedly obtained illegally against Rauda.  Notably, even in *Gordon*, the court ultimately denied suppression and allowed the cellphone into evidence on grounds that the taint had been dissipated by the time that the third-party voluntarily provided the cellphone to the police.  *Id*. at 1005-1009.

"in the next two weeks." [Exhibit 3, ¶ 12]. However, in the affidavit for the Ping Warrant, the relevant time period was "eight days," and the buyer "had to" pick up the shipment within that time period. [Exhibit 1, pg. 4].

[65] at 5-6. More precisely, according to S/A Ledgerwood's testimony at the hearing, the CI had told him on April 30, 2018 that the transaction was expected within "8-14 days." Tr. [99] at 42. S/A Ledgerwood then testified in his affidavit that the transaction was expected "in the next two weeks" from April 30. [65-3] ¶ 12. However, Investigator Saunders' affidavit stated that the transaction was to be within "eight days" of April 30. *See* [64-1].

This record is confusing, but fails to demonstrate any indication that S/A Ledgerwood made a false statement in the federal search warrant application. His more general statement "in the next two weeks" necessarily includes the 8-14 day estimate he later attributed to the CI, as well as the "within eight day" period attested to by Investigator Saunders. All of this reflected relatively minor differences in the same general timeframe, with the statement in the federal warrant application being the most general and inclusive statement of all. Thus, there is no falsity in this affidavit.

Nor were these differences material. Whether the timeframe was phrased as "in the next two weeks," "within eight days" or "8-14 days" would not have altered the existence of probable cause. And even if a timeframe was omitted altogether, probable cause would still clearly exist. Absent that detail, the federal warrant

application would still include (a) the CI's tip that the holder of the Subject Telephone was involved in an anticipated pick up of drugs from a source in Mexico, (b) the agents' direct surveillance observations, in which they followed the Target Vehicle to a parking lot of a closed commercial operation at night, and saw individuals load 55 gallon plastic drums from a Freightliner truck to the Target Vehicle, (c) the agents' surveillance of the Freightliner to another meet with another vehicle, (d) the agents' search of the Freightliner later that evening, finding a bag containing $30,000 in cash, and a cellphone (which the driver had tried to conceal) revealing conversations with the holder of the Subject Telephone as well as with Mexican telephone numbers, and (e) a positive alert by a drug sniffing dog as to the presence of narcotics on the currency seized in the Freightliner.   The exact wording of the anticipated timeframe back on April 30th—and even the existence of any timeline provided by the CI at all—was immaterial to the clear probable cause that existed based on all these facts.[10]

---

[10] Although a timeframe was not required to show probable cause for this warrant, it could also be inferred from the remainder of the CI's April 30th tip that the transaction was anticipated soon.  According to the CI's tip, the transaction involved a specific anticipated shipment of drugs in a specific quantity, for which a specific buyer had already arranged to pick up a specific amount.  It could be inferred that such details were most likely associated with conduct that was already underway and a deal that was somewhat imminent.

In addition to the alleged affirmative misrepresentation as to the time frame of the anticipated transaction, Defendant alleges certain material omissions from S/A Ledgerwood's affidavit.   Specifically:

> He did not inform the federal magistrate [judge] that the CI had provided a specific address in Lawrenceville, that an additional twenty kilograms had been expected to arrive there, or that the holder of the device was never tracked to that location. [Exhibit 1].  These facts are material because they served as the basis for the entire investigation.  Although the information provided by the CI turned out to be false, law enforcement did not inform the federal magistrate [judge] and instead made changes and omitted details as they deemed necessary

[65] at 6.

Inclusion of these omitted facts would not "have prevented a finding of probable cause." *Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).  That the future transaction allegedly anticipated by the CI as of April 30th may not have occurred as of May 11th exactly as contemplated would not necessarily have suggested that either the CI nor the agents were lying.  By the time of the federal warrant application, the basic tip by the CI as to the drug trafficking activities of the holder of the Subject Telephone was strongly corroborated by other facts, including the officers' observations of a transfer of 55-gallon drums at night in an empty parking lot to the Subject Vehicle, the discovery of $30,000 thousand worth of bundles of narcotics-scented cash in the Freightliner that had transferred the drums, along with a concealed cell phone that showed communications between and among the Subject Telephone, the Freightliner driver, and Mexican phone numbers.  By this

point, the original April 30th CI tip was largely helpful just for background context and had been superseded in significance by these more probative subsequent developments.  Moreover, the basic tip itself—that the user of the Subject Telephone was involved in receiving narcotics smuggled from a Mexican source— was substantially corroborated.  Probable cause would not have been destroyed by providing the additional information about Grayland Court and showing that the Subject Telephone had not traveled there.  Thus, Dominguez's Motion fails.

## CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Motions to Suppress Evidence [64][65] be **DENIED**, except insofar as the Motions seek suppression of the Defendants' post-arrest statements, as to which the Motions are **DEFERRED** to the District Judge.  The Court **GRANTS** the Government's Motion for Leave to File Excess Pages [111].  This matter is **READY FOR TRIAL**.

IT IS SO **ORDERED AND RECOMMENDED** this 6th day of August, 2019.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE